STANDARD FEDERAL BANK, as the successor in interest of Colonial Central Savings Bank, F.S.B., Plaintiff,

v.

The BISYS GROUP, Defendant.

No. 94–73977.

United States District Court,
E.D. Michigan,
Southern Division.

July 12, 1995.

As Corrected March 25, 1996.

Bert T. Ross, Charles E. Turnbull, O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C., Sterling Heights, MI, for plaintiff.

Richard G. Ward, Sullivan, Ward, Bone, Tyler & Asher, P.C., Southfield, MI, for defendant.

### MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This is a contract case. Plaintiff Standard Federal Bank (Standard Federal) is suing the Bisys Group, Inc. (Bisys) to recoup monies Standard Federal paid under protest to terminate a contract. The contract was entered into by a division of Automatic Data Processing, Inc. (ADP), which Bisys has since acquired, for the sale of ADP data processing services to Colonial Central Savings Bank (Colonial Central) which has since merged into Standard Federal. The amount due upon termination of the contract was based upon the date "the Client ... merged or ... entered into a binding agreement to be merged." The parties dispute this date and, consequently, the amount owed upon termination of the contract.

Before the Court are cross-motions for summary judgment. For the reasons that follow, Standard Federal's motion will be denied and Bisys' motion will be granted.

## II.

In July 1987, Colonial Central and a division of ADP entered into a contract for data processing services for an eight year term commencing November 14, 1987, at a minimum charge of $11,000 per month. Paragraph 11 of an addendum to the contract included an early termination provision which read:

11. Notwithstanding anything to the contrary set forth herein, *if Client is merged or acquired, or has entered into a binding agreement to be merged or acquired by an organization which does not have a valid Services Agreement with the Thrift Services Division of ADP at any time during the Initial Period, Client may terminate the Agreement prior to the expiration of the Initial Period* upon at least 180 days prior written notice to ADP, which termination shall not be effective until at least 12 month after the date of such binding agreement and until ADP has been paid the following amounts by Client:

(a) all monies due and payable for services provided by ADP to Client through the date of the Agreement is terminated by Client in accordance herewith....

(emphasis added).[1] In August, 1989, Bisys acquired the division of ADP that entered into the contract.

At the time of the contract, Colonial Central was a wholly owned subsidiary of Central Holding Company (Central Holding). On October 26, 1993, Central Holding entered into "an agreement to merge" with a wholly owned subsidiary of Standard Federal, CHC Acquisition Corporation (CHC Acquisition) (Parent Merger Agreement). The Parent Merger Agreement was an "Agreement and Plan of Reorganization" signed by Standard Federal Bank, CHC Acquisition and Central Holding.

The introduction to the Parent Merger Agreement stated in part:

The Boards of Directors of CHC Acquisition and [Central Holding] have each duly approved this Agreement. *Upon effective-ness of the Merger, Colonial Central Savings Bank, F.S.B. (the "Bank") a wholly-owned subsidiary of [Central Holding], will merge with and into [Standard Federal], subject to all required governmental approvals.*

The Parent Merger Agreement included two annexes and a number of exhibits. Annex II was a "Bank Merger Agreement" and provided:

As contemplated by the Parent Merger Agreement, the respective Boards of Directors of each constituent association deem it advisable and in the best interest of each such constituent association and its shareholders that [Colonial Central] be merged with and into [Standard Federal] in the manner contemplated herein, and each such Board has adopted resolutions approving this Merger Agreement and the merger of Colonial with and into Standard (the "Bank Merger").

The Bank Merger Agreement included signature lines for Standard Federal and Colonial Central, but was not signed at this time. An integration clause in the Parent Merger Agreement stated that the Parent Merger Agreement "together with the Annexes and the Schedules hereto, constitutes the entire Agreement between the parties pertaining to the subject matter hereof ..."

Central Holdings' obligations under the Parent Merger Agreement were subject to either satisfaction or waiver of conditions which included approval by its shareholders and approval by the Office of Thrift Supervision (OTS), an office of the United States Department of Treasury. The Parent Merger Agreement stated that the obligation of Standard Federal and Central Holding "to consummate the transactions provided for by this agreement are subject to the satisfaction of 'all consents, approvals, and waivers from third parties and governmental agencies necessary to permit the transactions contemplated by the Agreement,'" in addition to other conditions. The Bank Merger Agreement stated that "[c]onsummation of the Merger is conditioned upon ... the satisfaction or waiv-

---

1. It appears to be undisputed that the purpose of paragraph 11 was to limit Colonial's obligations to BISYS in the event Colonial was involved in a merger which would result in Colonial no longer requiring the services of BISYS.

er of all conditions set forth" in the Parent Merger Agreement, "receipt of any necessary approval ... by the OTS" and acceptance of the Bank Merger Agreement by Central Holding as the sole shareholder of Colonial Central.

On the same day that Central Holding and Standard Federal representatives signed the Parent Merger Agreement, the Board of Directors of Colonial Central passed a resolution "authorizing and directing" Robert Schuster, President and Chief Executive Officer of Colonial Central to execute the Bank Merger Agreement on behalf of Colonial Central.

In February, 1994, Schuster sent a letter to Bisys, authorizing Bisys to release data files to Standard Federal to enable the conversion of Colonial Central's data files as a necessary part of the merger. The letter stated that:

> [w]e anticipate that the merger will be completed and the data processing conversion will occur on April 9, 1994. Furthermore, this letter will serve as notice from Colonial Central to terminate its data processing services contract with BISYS.

Bisys responded, stating that the termination would not be effective until twelve months after the date of the "binding agreement" and until it received payment for these final twelve months. This letter stated that the date of the binding agreement would be April 9, 1994, the anticipated date that the merger would become effective.

In March 1994, Colonial Central received stockholder approval for the merger. On April 4, 1994, Standard Federal paid the amount requested by Bisys under protest. The same day, Schuster wrote Bisys, disputing that the date of "binding agreement" was April 9, 1994. He stated that the relevant date was October 26, 1993, the date the Parent Merger Agreement was signed. Bisys wrote in response that because the

agreement to merge would not be effective until regulatory approval was secured, the date of binding agreement was April 9, 1994.

On April 8, 1994, OTS approved the merger and Standard Federal and Colonial Central executed the Bank Merger Agreement. Standard Federal then brought this lawsuit to recoup the "excess" amount it paid pursuant to termination of the contract with ADP. Standard Federal claims that Bisys breached the contract by requiring Standard Federal to pay for approximately six additional months of service.[2]

### III.

Standard Federal contends that for purposes of paragraph 11 of the contract, the "Client" entered into a binding agreement to merge on October 26, 1993. Standard Federal argues that even though the Parent Merger Agreement was between Standard Federal, Central Acquisition and Central Holding, Colonial Central intended to be bound by the agreement as shown by the resolution its board of directors signed on the same day the Parent Merger Agreement was executed. Also, Colonial Central was a party to the Bank Merger Agreement in Annex II which Standard Federal argues was integrated into the Parent Merger Agreement. Standard Federal further points to the affidavit of Mark Mudge, the president of Colonial Central when the contract with ADP was made, who states that it was "intended and understood" that Central Holding had the authority to enter into a binding agreement for the merger of Colonial Central because, at the time, Central Holding's sole business was the ownership of its operating subsidiaries.[3] Standard Federal contends that regulatory approval was a condition which qualified the duty of performance under the Parent Merger Agreement, but did not qualify its binding nature.[4]

---

**2.** Standard Federal seeks to recover approximately $66,000 ($11,000 × 6 months). The amount is approximate because the difference between October 26, 1993 and April 8, 1994 is not exactly six months.

**3.** It is not clear that Central Holding had any subsidiaries other than Colonial Central at the time of the merger.

**4.** Standard Federal also argues that an additional termination provision, paragraph 6, is applicable. However, the Court need not discuss this alternate theory. Paragraph 6 only allowed ter-

Bisys contends that Colonial Central, the "Client" referred to in paragraph 11, was not a party to the Parent Merger Agreement and therefore did not enter into a binding merger agreement when the document was executed on October 26, 1993. Alternatively, Bisys argues that even if the Parent Merger Agreement did include Colonial Central as a party, it did not "bind" Colonial Central until regulatory approval for the merger was received on April 8, 1994.

## IV.

■ There are essentially two questions: (1) whether a binding agreement to merge was entered into on October 26, 1993; and (2) whether Colonial Central "entered into" that agreement. However, neither one of these questions presents a triable issue. The Parent Merger Agreement was a binding agreement, but not one which was entered into by Colonial Central. The Board of Directors Resolution did not constitute a binding agreement. Summary judgment in favor of Bisys is therefore appropriate.

## A.

■ While the Parent Merger Agreement was a binding agreement between Central Acquisition, Central Holding and Standard Federal,[5] Colonial Central was not one of the parties that entered into the Parent Merger Agreement. The introductory language in the Parent Merger Agreement shows that its purpose was to enable the banks to merge. From this, it is tempting to find that the banks were bound to follow through on the contemplated transaction. However, Colonial Central simply did not sign the Parent Merger Agreement and did not become bound by it through Central Holding's signature. "A corporation is a legal entity distinct from its shareholders, even though all of the stock is held by a single individual." *Kettlewell Excavating, Inc. v. St. Clair Co. Health Dept.*, 187 Mich.App. 633, 639, 468 N.W.2d 326 (1991). A contract made by a sole shareholder or controlling shareholder is not ordinarily binding on the corporation. *Industrial Steel Stamping v. Erie State Bank*, 167 Mich.App. 687, 692, 423 N.W.2d 317 (1988).

"One justification for looking beyond a corporate entity is to accomplish a just result." *Id.* However, the record shows no reason why a just result requires that Colonial Central be bound by the actions of Central Holding. The facts here are not similar to those of *Industrial Steel.* See *id.* (shareholder made agreement with an employee in exchange for the employee's support of the shareholder in obtaining control of corporation, and once shareholder successfully obtained control of corporation, corporation was bound by the shareholder's agreement with the employee).

## B.

■ The Bank Merger Agreement was not a binding agreement because it was not signed on October 26, 1993, and was not intended to be signed until regulatory approval was secured on April 8th. The integration clause in the Parent Merger Agreement cannot function as a substitute for the

---

mination for any reason during the 36th "month," not "months," prior to natural expiration of the contract. Colonial Central did not give notice in the 36th month prior to termination of the contract and therefore cannot invoke paragraph 6.

5. The condition of regulatory approval did not affect the binding nature of the Parent Merger Agreement, but merely qualified the parties' duty of performance so that if regulatory approval was not secured despite Standard Federal's good faith efforts, the parties could walk away from the merger. By signing the Parent Merger Agreement, the parties agreed that they had this option if regulatory approval was not secured. However, once regulatory approval was secured and all of the other conditions to the Parent

Merger Agreement were met, the obligations of the parties became fixed without the necessity of any further agreement. *See* Farnsworth, Contracts 2d ed. § 8.2 at 567 (1990) ("If parties make a contract under which neither has a duty to perform until the occurrence of some event, such as ... the approval of a third party, that event is a condition of the duty of each party. *Both parties are bound by the contract, although neither will have to perform if the event does not occur*") (emphasis added). This should be distinguished from the "conditional acceptance" of an offer which does not create a contract. A "conditional acceptance" is not operative as an acceptance for the reason that there is no mutual assent. The "conditional acceptance" becomes a counter-offer. 3 Williston on Contracts (Rev. ed.), § 629A at 21.

missing signatures. Its function was to prevent the addition of new terms to the contract by stating that the contents of the documents constituted the entire agreement between the parties. Its function was not to make the Bank Merger Agreement effective upon execution of the Parent Merger Agreement. The integration clause cannot mean that an unsigned part of the document was nevertheless executed when another part was signed if the two parts had signature lines for different parties.

### C.

■ The Board of Directors' resolution also does not constitute a binding agreement between Standard Federal and Colonial Central to merge. While the resolution suggests that Colonial Central had every intention of going forward with the merger by executing the Bank Merger Agreement once regulatory approval for the merger was obtained, it did not bind Colonial Central to this course of action. The resolution "authoriz[ed] and direct[ed]" the president of Colonial Central to execute the Bank Merger Agreement on behalf of Colonial Central at the appropriate time. It was not an agreement between Colonial Central and Standard Federal. If Colonial Central did not execute the Bank Merger Agreement after regulatory approval for the merger was secured, Standard Federal may have had a claim for breach of contract against Central Holding because of promises made in the Parent Merger Agreement, but Standard Federal would not have had a claim against Colonial Central. Further, prior to execution of the Bank Merger Agreement, Colonial Central's Board of Directors could have executed a resolution authorizing and directing the president not to execute the Bank Merger Agreement. Again, such an event would not have given rise to a claim by Standard Federal against Colonial Central despite whatever rights Standard Federal may have had against Central Holding.

### V.

For the reasons stated, Standard Federal's motion for summary judgment is DENIED and Bisys' motion for summary judgment is GRANTED. The case is DISMISSED.